# United States Court of Appeals for the Federal Circuit

2006-1515


BIOMEDICAL PATENT MANAGEMENT CORPORATION,

Plaintiff-Appellant,

v.


STATE OF CALIFORNIA, DEPARTMENT OF HEALTH SERVICES,

Defendant-Appellee.


Andrew J. Dhuey, of Berkeley, California, argued for plaintiff-appellant. With him on the brief was Richard Kirk Cannon.

Susan J. King, Deputy Attorney General, United States Department of Justice, of San Francisco, California, argued for defendant-appellee.

Appealed from: United States District Court for the Northern District of California

Judge Marilyn Hall Patel

# United States Court of Appeals for the Federal Circuit

2006-1515

BIOMEDICAL PATENT MANAGEMENT CORPORATION,

Plaintiff-Appellant,

v.

STATE OF CALIFORNIA, DEPARTMENT OF HEALTH SERVICES,

Defendant-Appellee.

_____

DECIDED:  October 23, 2007

_____

Before RADER and GAJARSA, Circuit Judges, and O'MALLEY, District Judge.

O'MALLEY, District Judge.[*]

The issue presented in this appeal is whether a State is entitled to assert its sovereign immunity under the Eleventh Amendment where the State intervened in an earlier, related action that was dismissed for improper venue.  The district court concluded that a State was entitled to assert its Eleventh Amendment sovereign immunity in those circumstances and, accordingly, granted a motion to dismiss on that ground filed by Defendant-Appellee State of California, Department of Health Services ("DHS").  Plaintiff-Appellant, Biomedical Patent Management Corporation ("BPMC"), appeals that decision.  Because we agree that DHS's initial waiver of Eleventh

---

[*]     Honorable Kathleen M. O'Malley, District Judge, United States District Court for the Northern District of Ohio, sitting by designation.

Amendment sovereign immunity does not extend to this case or judicially estop DHS from asserting immunity in this case, we affirm.

I

BPMC alleges that it is the owner of United States Patent No. 4,874,693 ("the '693 patent"), entitled "Method for Assessing Placental Dysfunction," and issued on October 17, 1989. The '693 patent describes a method for screening birth defects in pregnant women, though a detailed description of the patent is not necessary to resolve the issues presented in this appeal. BPMC alleges in this case that DHS performs laboratory services, and induces others to perform services, that infringe the '693 patent. It asserts four claims against DHS: claims for literal patent infringement, both directly and by inducement; and claims for patent infringement under the doctrine of equivalents, both directly and by inducement. For relief, BPMC seeks money damages, treble damages for willful infringement, prejudgment interest, costs, expenses, and attorneys fees. As indicated below, this litigation is not the first litigation between these parties involving the '693 patent.

A.    The 1997 Lawsuit

On August 28, 1997, Kaiser Foundation Health Plan, Inc. ("Kaiser"), a subcontractor of DHS, filed a declaratory judgment action against BPMC in the United States District Court for the Northern District of California, seeking a declaratory judgment that the DHS screening program does not infringe the '693 patent and that the '693 patent is invalid (hereinafter, "the 1997 lawsuit").[1]  DHS moved to intervene in the

---

[1]    Although not part of the allegations contained in BPMC's Complaint in the present case, the district court took judicial notice of several court filings from prior litigation between these parties. We also consider these court filings, which

2006-1515                                    2

1997 lawsuit, attaching a complaint in intervention that also sought a declaration of non-infringement and invalidity as to the '693 patent. The district court granted DHS's motion to intervene over BPMC's objection. At that time, BPMC asserted a compulsory counterclaim against DHS for infringement of the '693 patent, including a prayer for money damages. The compulsory counterclaim in that lawsuit contained the same four counts BPMC asserted in its Complaint in the instant action. Thereafter, BPMC filed a motion to dismiss the action for improper venue pursuant to Fed. R. Civ. P. 12(b)(3), which the district court granted. The 1997 lawsuit was dismissed in its entirety, without prejudice, on May 6, 1998.

## B. The 1998 Lawsuit

On May 11, 1998, five days after dismissal of the 1997 lawsuit, BPMC filed a new action against DHS for infringement of the '693 patent in the United States District Court for the Southern District of California (hereinafter, "the 1998 lawsuit").[2] DHS answered and asserted the defense of sovereign immunity,[3] but did not assert a counterclaim.

---

are matters of public record, for purposes of this appeal. Neither party argues that the district court improperly took notice of these filings, and we do not find that the district court abused its discretion in doing so. See Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001) ("We review a district court's decision to take judicial notice for abuse of discretion.").

[2] BPMC also filed a separate lawsuit against Kaiser in the United States District Court for the Southern District of California, a case that, upon motion by DHS, was consolidated with BPMC's suit against DHS. Kaiser filed a counterclaim for declaratory judgment of non-infringement and invalidity as to the '693 patent in that action. Ultimately, Kaiser was dismissed from the consolidated action after BPMC entered into a covenant not to sue Kaiser and voluntarily dismissed its claims against Kaiser.

[3] All references to "sovereign immunity" in this opinion are to Eleventh Amendment sovereign immunity. DHS attempts to distinguish between a State's sovereign immunity under the Eleventh Amendment and its so-called inherent sovereign

Shortly after the 1998 lawsuit was filed, the Supreme Court granted a petition for a writ of certiorari to review this court's decision in Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 148 F.3d 1343, 1355 (Fed. Cir. 1998), cert. granted, 525 U.S. 1064 (Jan. 8, 1999) (No. 98-531), in which we held that Congress, through the Patent and Plant Variety Protection Remedy Clarification Act ("Patent Remedy Act"), validly abrogated the sovereign immunity of the States to suit for patent infringement. Because of the potential impact of the Supreme Court's pending decision in Florida Prepaid on the 1998 lawsuit, BPMC sought to voluntarily dismiss the 1998 lawsuit without prejudice under Fed. R. Civ. P. 41(a)(2) to await that decision. Although DHS opposed the voluntary dismissal to the extent that it was without prejudice, the district court dismissed the case without prejudice on November 17, 1998.

On June 23, 1999, the Supreme Court issued its decision in Florida Prepaid, reversing the decision of this court and concluding that Congress' abrogation of State sovereign immunity from patent infringement claims was invalid. Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank, 527 U.S. 627, 630 (1999). As a result of Florida Prepaid, States retained their sovereign immunity to suit for patent infringement.

C.    The Present Lawsuit

On February 2, 2006, BMPC filed the present lawsuit against DHS in the United States District Court for the Northern District of California, the same venue in which

---

immunity, arguing that a State may waive one but not the other in federal court. We express no opinion as to this argument, as it is unnecessary to reach it to resolve the issues presented in this appeal.

BMPC had successfully moved to dismiss the 1997 lawsuit for improper venue.[4]  DHS moved to dismiss this case on the ground that sovereign immunity under the Eleventh Amendment barred BPMC's claims.   The district court granted the motion and dismissed the case.  Biomedical Patent Mgmt. Corp. v. Cal., Dept. of Health Servs., No. 06-00737, 2006 WL 1530177, at *7 (N.D. Cal. June 5, 2006).   BMPC filed a timely notice of appeal.

II

BPMC does not dispute that DHS, as an arm of the State of California, generally is accorded Eleventh Amendment immunity.  See, e.g., Alden v. Maine, 527 U.S. 706, 756 (1999) (observing that an arm of a State may assert sovereign immunity).  It has long been recognized, however, that a State's sovereign immunity is "a personal privilege which it may waiver at its pleasure."   Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 675 (1999) (quoting Clark v. Barnard, 108 U.S. 436, 447 (1883)); see also Tegic Commc'ns Corp. v. Bd. of Regents of the Univ. of Tex. Sys., 458 F.3d 1335, 1340 (Fed. Cir. 2006) (explaining that the Eleventh Amendment "enacts a waivable immunity from suit, not a 'non-waivable limit on the federal judiciary's subject-matter jurisdiction.'" (quoting Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, 267 (1997))).  As the Supreme Court has explained, "[w]hile this immunity from suit is not absolute, we have recognized only two circumstances in which an individual may sue a state."   Coll. Sav. Bank, 527 U.S. at 670.  Those circumstances occur where Congress validly authorizes such a suit "in the exercise of its power to

---

[4]      As to why it filed an action in a venue that it previously fought as improper, BMPC explains only that "[c]ircumstances no longer dictated that suit be resumed in San Diego."

enforce the Fourteenth Amendment," or where a State has waived its sovereign immunity by consenting to suit. Id. In the present case, only the latter circumstance is at issue. "Generally, we will find a waiver either if the State voluntarily invokes our jurisdiction, or else if the State makes a clear declaration that it intends to submit itself to our jurisdiction." Id. at 676-77 (internal quotation and citations omitted).

As an initial matter, it is clear that, by intervening and asserting claims against BPMC in the 1997 lawsuit, DHS voluntarily invoked the district court's jurisdiction and, thus, waived its sovereign immunity for purposes of that lawsuit. "[I]t has long been established that a state waives its Eleventh Amendment immunity when it consents to federal court jurisdiction by voluntarily appearing in federal court." Regents of the Univ. of N.M. v. Knight, 321 F.3d 1111, 1124 (Fed. Cir. 2003) (citing Clark v. Barnard, 108 U.S. 436, 447 (1883)); see also Gunter v. Atl. Coast Line R.R. Co., 200 U.S. 273, 284 (1906) ("[W]here a state voluntarily become[s] a party to a cause, and submits it rights for judicial determination, it will be bound thereby, and cannot escape the result of its own voluntary act by invoking the prohibitions of the 11th Amendment."). Indeed, as it relates specifically to intervention, the Supreme Court held over 100 years ago in Clark that "the voluntary appearance of [a] state in intervening as a claimant [in an interpleader action]" constitutes a waiver of Eleventh Amendment immunity. Clark, 108 U.S. at 447-48. The Supreme Court recently reaffirmed this proposition. See Lapides v. Bd. of Regents of the Univ. Sys. of Georgia, 535 U.S. 613, 619 (2002) (citing Clark with a parenthetical explanation that a "State's 'voluntary appearance' in federal court as an intervenor avoids Eleventh Amendment inquiry."). In addition, DHS's intervention

also waived immunity as to all compulsory counterclaims that BPMC asserted in that lawsuit. See Knight, 321 F.3d at 1125-26. Based on well-established Eleventh Amendment jurisprudence, therefore, DHS waived its sovereign immunity in the 1997 lawsuit, at least for purposes of that lawsuit.[5]

Having found that DHS's intervention in the 1997 lawsuit constituted a waiver of its sovereign immunity in that suit, the question we must resolve in this case is when, if ever, a waiver of immunity in an earlier lawsuit prevents a State from asserting sovereign immunity in a later lawsuit between the same parties. BPMC asserts two grounds upon which it premises its contention that DHS's earlier waiver should prevent it from asserting sovereign immunity in this case: (1) DHS's waiver in the 1997 lawsuit extends or carries over to the instant lawsuit because the instant lawsuit involves the same subject matter and same parties; and (2) DHS should be judicially estopped from asserting immunity because the district court in the 1997 lawsuit accepted DHS's jurisdictional arguments in allowing DHS to intervene. In addition, BPMC advances two other arguments, unrelated to the waiver in the 1997 lawsuit, as to why DHS is not entitled to sovereign immunity in this case: (1) the conduct of the State of California in the patent system, and particularly patent litigation, operates as a general waiver for all California State defendants participating in patent suits; and (2) a recent Supreme Court

---

[5]   DHS's argument to the contrary is unavailing. DHS argues that, at the time it intervened in 1997, it was not well-established that a state's intervention in a lawsuit amounted to a waiver of sovereign immunity. As demonstrated by the long-standing case law cited in this opinion, that argument is without support. We note, moreover, that DHS's reliance on State Contracting & Eng'g Corporation v. Florida, 258 F.3d 1329 (Fed. Cir. 2001) is misplaced. Quite simply, the filing of a protective counterclaim, as the State did in that case, is qualitatively different from the affirmative act of intervening in a lawsuit in which one has not otherwise been made a party, as DHS did in 1997.

decision, <u>Central Virginia Community Coll. v. Katz</u>, 546 U.S. 356 (2006), implicitly overruled <u>Florida Prepaid</u> such that sovereign immunity is no longer available in patent infringement actions. We address these arguments in turn.

A

BPMC first argues that DHS's waiver in the 1997 lawsuit extends or carries over to the instant lawsuit because this action involves the same subject matter and the same parties. This court applies Federal Circuit law, rather than regional circuit law, to the issue of Eleventh Amendment waiver. <u>Knight</u>, 321 F.3d at 1123-24. We review <u>de novo</u> a district court's judgment of dismissal on Eleventh Amendment grounds. <u>Id.</u> at 1124; <u>see also</u> <u>Tegic</u>, 458 F.3d at 1339 ("The constitutional issue of Eleventh Amendment immunity is given plenary review.").

In rejecting BPMC's first theory, the district court primarily relied on a Ninth Circuit case, <u>City of S. Pasadena v. Mineta</u>, 284 F.3d 1154 (9th Cir. 2002), though recognizing that Federal Circuit law should be applied, to the extent that it exists. <u>Biomedical Patent Mgmt. Corp.</u>, 2006 WL 1530177, at *3-4. In <u>City of S. Pasadena</u>, the Ninth Circuit held that the State of California's waiver of immunity in an earlier lawsuit, one that was voluntary dismissed under Fed. R. Civ. P. 41(a)(1), did not carry over to a re-filed action involving the same dispute. <u>City of S. Pasadena</u>, 284 F.3d at 1157-58. The court found that the voluntary dismissal under Rule 41(a)(1) left "the situation as if the action never had been filed," <u>id.</u> at 1157 (citing 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2367 (2d ed.1995)), explaining that the result of such a dismissal is that "any future lawsuit based on the same claims is an entirely

new lawsuit unrelated to the earlier (dismissed) action." Id. The Ninth Circuit held that, because a case filed after a Rule 41(a)(1) dismissal is an entirely new action, no waivers from a voluntarily dismissed action are carried-over to such a re-filed suit, including a State's Eleventh Amendment waiver. Id.

The district court in this case found that, like a dismissal under Rule 41(a)(1), a dismissal for improper venue "leaves the situation as if the action had never been filed." Biomedical Patent Mgmt. Corp., 2006 WL 1530177, at *4 (citing 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2373 n.8 (2d ed.1995)). Accordingly, the district court held that the dismissal of the 1997 lawsuit disallowed the carry-over of DHS's waiver of immunity to any later action, and, therefore, that DHS was entitled to raise sovereign immunity in this case. Id.

On appeal, BPMC argues that the district court erred because it should have applied the rule set forth in Lapides, which was decided after City of S. Pasadena. In Lapides, the Supreme Court held that a State's removal of a case to federal court constituted voluntary invocation of the court's jurisdiction and, accordingly, waiver of the State's Eleventh Amendment sovereign immunity. Lapides, 535 U.S. at 624. In that case, an arm of the State of Georgia, sued as a defendant, removed a case to federal district court and then argued that it was immune from suit in federal court by virtue of the Eleventh Amendment. Id. at 616. The Supreme Court rejected that argument, explaining that "[i]t would seem anomalous or inconsistent for a State both (1) to invoke federal jurisdiction, thereby contending that the 'Judicial power of the United States' extends to the case at hand, and (2) to claim Eleventh Amendment immunity, thereby

2006-1515                                    9

denying that the 'Judicial power of the United States' extends to the case at hand." Id. at 619. In doing so, the Court first noted well-established precedent holding that a State's voluntary appearance in federal court constituted a waiver of Eleventh Amendment sovereign immunity. Id. (citing Gardner v. New Jersey, 329 U.S. 565, 574 (1947); Gunter, 200 U.S. at 284; Clark, 108 U.S. at 447). The Court then held that, because removal is a form of voluntary invocation of a federal court's jurisdiction, removal is "sufficient to waive the State's otherwise valid objection to litigation of a matter (here of state law) in a federal forum." Id. at 624. In addition, the Supreme Court distinguished between the constructive waivers repudiated in Col. Sav. Bank, see infra Part II.C, and waivers effected by affirmative litigation conduct, noting that waiver by litigation conduct "rests upon the [Eleventh] Amendment's need to avoid inconsistency, anomaly, and unfairness, and not upon a State's actual preference or desire, which might, after all, favor selective use of 'immunity' to achieve litigation advantages." Id. at 620.

BPMC focuses on two aspects of Lapides to argue that DHS's 1997 waiver of immunity extends to the present case. First, BPMC places great significance on the Supreme Court's use of the word "matter" in holding that voluntary invocation of a federal court's jurisdiction waives a State's "otherwise valid objection to litigation of the *matter* in a federal forum." Id. at 624 (emphasis added). BPMC argues that "matter" signifies the subject matter of the lawsuit, not the case at hand, such that the waiver would apply to a *later* lawsuit involving the same subject matter. Second, BPMC focuses on the distinction drawn by the Supreme Court between a constructive waiver

and a waiver by litigation conduct, arguing that the principles behind the rule governing waiver by affirmative litigation conduct -- avoiding unfairness and inconsistency -- should apply here to prevent DHS from asserting sovereign immunity in this case.

Neither of BPMC's arguments compels the result it urges. First, there is no reason to place significance on the Supreme Court's use of the term "matter" in Lapides, and BPMC offers none other than its own self-serving interpretation. Even if the term "matter" can be read, as BPMC suggests, to mean "subject matter" rather than "case" (or "action," "litigation," "lawsuit," etc.), BPMC's contention is belied by the Court's other statements in Lapides. Elsewhere in the opinion, the Court states that it would be inconsistent to allow a State to invoke jurisdiction for the "*case at hand*" and then to claim Eleventh Amendment immunity, thereby denying that jurisdiction extends to the "*case at hand.*" Id. at 619 (emphasis added). The Court also explains that it would be unfair to allow a State to take both positions in "*the same case.*" Id. (emphasis added). Certainly "the case at hand" and "the same case" indicate more narrow parameters for the scope of the waiver, and the semantic game in which BPMC attempts to engage actually cuts against its position.

In addition, we also reject BPMC's argument that the need to prevent unfairness and inconsistency requires a finding that DHS cannot assert immunity in the present lawsuit. BPMC misses one critical point that runs through almost all of the case law on which it relies: the waivers found in the cases cited by BPMC were based on actions by a State in the *same* case, not in cases that are either separated by a dismissal or cases that are entirely different actions. Lapides itself, of course, did not involve the effect of

waiver of immunity in one case on a State's ability to later assert immunity in a *separate* case; it involved waiver based on actions that occurred in the same action. This is a common thread in the authority on which BPMC relies.

In Gunter, for example, the Supreme Court held only that a State's waiver extended to an ancillary proceeding in the same matter, not to a separate or independent action. 200 U.S. at 292. In that case, a railroad company sought to enforce an injunction against the State of South Carolina that prohibited the State from collecting taxes from the railroad. Id. at 281. The injunction arose from an action twenty-five years earlier, when a shareholder of the railroad company brought an action to enjoin the collection of taxes from the railroad, claiming that an exemption granted by the South Carolina legislature prevented such collection. Id. at 278. The State did not raise the defense of sovereign immunity in the shareholder's action for an injunction, and the result was a decree enjoining the State from collecting the taxes, which was affirmed by the Supreme Court. See Humphrey v. Pegues, 83 U.S. 244 (1872). Twenty-five years later, the State sought to collect back taxes from the railroad's successor for the previous twenty years, and the railroad's successor brought the case to federal court to enforce the injunction. Gunter, 200 U.S. at 281. At that time, the State asserted Eleventh Amendment sovereign immunity, but the Supreme Court held that an immunity defense was not available to the State at that stage. Id. at 284, 292. Ultimately, the Court found that the State was enjoined from collecting the taxes at issue. Id.

BPMC argues that Gunter supports its position because that case involved two separate actions, according to BPMC, in which waiver of immunity in an earlier action was held to carry over to a later action.  A closer reading of Gunter, however, reveals that the disputes between the railroad and the State were part of *one continuous action*, a point that was critical to the Supreme Court's determination that the State could not assert immunity in the "later" action.  In Gunter, when the railroad sought to enforce the injunction twenty-five years later, it did not file a new case; rather, "[t]he petition which initiated the proceeding was filed as *ancillary* to the original Pegues Case, and *was entitle[d] and numbered as of that cause*.  It referred to the prior proceedings in the cause, including the perpetual injunction therein issued . . ." Id. at 281 (emphasis added).  That fact was crucial.  As the Supreme Court explained, "[i]ndeed, the proposition that the 11th Amendment . . . control[s] a court of the United States in administering relief, *although the court was acting in a manner ancillary to a decree rendered in a cause over which it had jurisdiction*, is not open for discussion." Id. at 292 (emphasis added).  As such, Gunter does not support BPMC's position that a waiver of sovereign immunity extends to a separate lawsuit; it involved a waiver in one continuous action, though one that continued for an extended period of time.

Likewise, in Vas-Cath Corp. v. Curators of the Univ. of Missouri, 473 F.3d 1376 (Fed. Cir. 2007), which BPMC submitted as supplemental authority on appeal, this court found that the waiver of Eleventh Amendment sovereign immunity extended to a later phase of a *continuous* proceeding.  In that case, the University of Missouri initiated interference proceedings at the Patent and Trademark Office ("PTO"), then, after

receiving a favorable ruling from the PTO, asserted sovereign immunity when the losing party sought review of the PTO's determination in federal court. Vas-Cath, 473 F.3d at 1378. This court held that the University, having voluntarily invoked and participated in PTO proceedings, was not entitled to assert sovereign immunity to bar adjudication of the appeal in federal court. Id. at 1383-84. In reaching that conclusion, we found that proceedings in the PTO bear "strong similarities" to civil litigation and, based on Lapides, Missouri's voluntary invocation of and participation in PTO proceedings constituted a waiver of immunity in those proceedings. Id. at 1382-83. Significantly, we noted that "the interference proceeding is a multi-part action with appeal as of right, starting in the PTO and culminating in court." Id. at 1382. Further, "[t]he civil action authorized by [35 U.S.C.] § 146 *is not a new claim, but an authorized phase of the interference proceeding* that is conducted by the PTO and is subject to judicial review." Id. (emphasis added). As with Gunter, the holding in Vas-Cath does not support BPMC's argument that a waiver of immunity applies to a separate proceeding; that case involved a waiver in a later phase of one continuous action. Vas-Cath, therefore, also does not support the result that BPMC urges in the present case.

Similarly, in New Hampshire v. Ramsey, 366 F.3d 1 (1st Cir. 2004), on which BPMC relies for the proposition that a State's waiver can survive a dismissal without prejudice, the waiver was found in the *same* proceeding, not a separate action. In Ramsey, the State of New Hampshire was sued in federal court for violation of federal law and moved to dismiss the suit for failure to exhaust statutorily-required administrative remedies. Id. at 9. The State did not assert Eleventh Amendment

immunity in that initial suit. Id. The district court dismissed the suit without prejudice for failure to exhaust, and the parties, including the State, proceeded to engage in the statutorily-provided administrative remedies. Id. at 10-12. The State did not assert Eleventh Amendment immunity until two years into the administrative remedy process, after it had already filed an unsuccessful motion to dismiss on other grounds. Id. at 12. When a federal arbitration panel found in favor of the plaintiffs on the merits of the case (without considering the Eleventh Amendment argument), the State filed suit in federal court challenging the ruling on the basis of the Eleventh Amendment. Id. at 13-14. The federal district court largely affirmed the arbitration panel's award, finding that the State had waived its immunity by its litigation conduct. Id. at 14.

On appeal, the First Circuit affirmed the district court's decision in part, holding that the State had waived its immunity as to injunctive relief by its litigation conduct, but not as to money damages (waiver as to money damages is discussed infra at n.6). Id. at 15. As to the claim for injunctive relief, the court held that, "[b]y invoking [the applicable] procedures (knowing that those procedures ultimately provided for federal judicial review) to obtain dismissal of a claim for injunctive relief, and then participating in the administrative process, the state has waived any immunity it may have to a federal forum and prospective equitable relief." Id. at 16. Framing its decision in the terminology of Lapides, on which the First Circuit relied heavily, it explained that, "[i]n essence, the state voluntarily invoked the jurisdiction of a federal agency . . . and the federal courts in review of the agency determination, including their power to grant

prospective equitable relief, even though it was not formally the plaintiff in the administrative proceeding." Id.

Ramsey, therefore, is a relatively straightforward application of Lapides that does not support BPMC's position in this case. In Ramsey, the State's initial waiver of immunity in the first suit, which was dismissed for failure to exhaust administrative remedies, had very little to do with the court's ultimate conclusion that the State waived its immunity when it invoked the statutorily-provided administrative remedies. Id. ("This case goes well beyond a simple matter of failure to raise an immunity argument in earlier proceedings."). Instead, it was the voluntary invocation of an administrative process that provided for federal judicial review that was the critical act amounting to waiver of immunity. Like the removal in Lapides, that initial voluntary invocation of the administrative remedies was found to constitute waiver of immunity. Beyond that initial invocation, Ramsey is similar to Vas-Cath in that the process invoked by the State was one continuous proceeding that included the jurisdiction of a federal agency followed by federal judicial review. See id. at 16 ("The state voluntarily put itself in the position of being a party in a federal administrative forum whose actions would be reviewed in federal court. The state's actions expressed a clear choice to submit its rights for adjudication in the federal courts."); Vas-Cath, 473 F.3d at 1383-84 ("The University's recourse to the PTO tribunal for adjudication of its claim . . . negates the assertion of immunity to bar appeal of that adjudication."). Accordingly, like Lapides, Gunter, and Vas-Cath, Ramsey only involves the application of a State's waiver of immunity in the

same continuous proceeding, and does not support BPMC's arguments in the case at bar.[6]

In contrast, where a waiver of immunity occurs in an earlier action that is dismissed, or an entirely separate action, courts, including our own, have held that the waiver does not extend to the separate lawsuit. See Tegic, 458 F.3d at 1342-43 (discussed below); City of S. Pasadena, 284 F.3d at 1157-58. In City of S. Pasadena, relied upon by the district court in this action and described above, the dismissal without prejudice was found to prevent the "carry over" of an earlier waiver to a new lawsuit. City of S. Pasadena, 284 F.3d at 1157-58. Likewise, in Tegic, this court held that a State university's participation in one lawsuit did not amount to a waiver of immunity in a separate lawsuit, even one involving the same patent. 458 F.3d at 1342-43.

---

[6] At oral argument, counsel for BPMC took issue with the comparison of Ramsey to Vas-Cath. Counsel argued that the initial waiver in the (dismissed) lawsuit in Ramsey *was* relevant to the First Circuit's holding, as evidenced by the fact that the First Circuit held that New Hampshire waived immunity as to injunctive relief (which the State failed to raise in the initial lawsuit), but not as to monetary damages (which the State made passing reference to in the initial lawsuit). According to counsel for BPMC, it was critical that the State in Ramsey failed to raise immunity as to claims for injunctive relief, the only claims in that initial lawsuit, but that it "alluded" to immunity from money damages in its motion to dismiss. We reject that reading of Ramsey. If anything, the First Circuit's finding that the State retained immunity from money damages represents a very narrow application of the waiver doctrine. In Ramsey, the State alluded to, but did not expressly assert, immunity from money damages in the first suit, failed to raise the defense of immunity until almost two years into the administrative remedies phase, and then invoked the jurisdiction of a federal district court to review the arbitration panel's decision. Ramsey does not stand for the proposition that a waiver of immunity can survive a dismissal without prejudice, as BPMC contends; rather, it stands for the proposition that the mere allusion to immunity from money damages in an earlier suit will preserve immunity, even after a State voluntarily invokes the jurisdiction of a federal agency and belatedly asserts immunity in that forum. Such a conservative approach to a State's waiver of sovereign immunity does not support BPMC's argument in this case. To the contrary, it cuts against it.

In <u>Tegic</u>, the University of Texas filed suit in federal court in the Western District of Texas against forty-eight cell phone companies alleging infringement of a patent it owned. <u>Id.</u> at 1337. Tegic, a Washington corporation, was not sued by the University but sold and licensed the allegedly infringing software to thirty-nine of the forty-eight defendants sued in the Texas action. <u>Id.</u> Rather than seek to intervene in the Texas action, Tegic brought a separate declaratory judgment action against the University in federal court in the Western District of Washington. <u>Id.</u> The University successfully moved to dismiss the Washington action on several grounds, including Eleventh Amendment immunity. <u>Id.</u> at 1338-39. This court affirmed dismissal of the case on the ground that it was barred by the University's Eleventh Amendment immunity, holding that the University's waiver as to the Texas suit did not extend to the suit by Tegic in Washington. <u>Id.</u> at 1342, 1345. We explained that, in waiving immunity in the Texas suit, the University "did not thereby voluntarily submit itself to a new action brought by a different party in a different state and a different district court." <u>Id.</u> at 1343. We also addressed the principle of waiver by litigation conduct, stating that, "[w]e agree with the University that its filing of the Texas action did not establish waiver as to this separate action. While waiver in the litigation context focuses on the litigation act, the waiver must nonetheless be 'clear.'" <u>Id.</u> (citing <u>Lapides</u>, 535 U.S. at 620). Our holding in <u>Tegic</u>, therefore, demonstrates that a State's waiver of immunity as to the subject matter of a lawsuit does not, by itself, constitute a waiver of immunity in any future lawsuit involving that subject matter, as BPMC seems to argue it should in the present case.

By distinguishing <u>Lapides</u>, <u>Gunter</u>, <u>Vas-Cath</u>, and <u>Ramsey</u>, on one hand, and <u>City of S. Pasadena</u> and <u>Tegic</u>, on the other, we do not mean to draw a bright-line rule whereby a State's waiver of sovereign immunity can never extend to a re-filed or separate lawsuit. We note only that the case law relied upon by BPMC does not support its contention that waiver of immunity in one suit should extend to a separate action *simply because* the action involves the same parties and same subject matter. Indeed, two relevant principles we can extract from these cases are that a State's waiver of immunity generally does *not* extend to a separate or re-filed suit, and that, as we reaffirmed in <u>Tegic</u>, even a waiver by litigation conduct must nonetheless be "clear." These principles, of course, are related, as a waiver that does not "clearly" extend to a separate lawsuit generally would not preclude a State from asserting immunity in that separate action. With those principles in mind, we address BPMC's arguments that the policy behind the rule governing waiver by litigation conduct -- the need to avoid unfairness and inconsistency – should prevent DHS from asserting sovereign immunity in this case.

In <u>Lapides</u>, the Supreme Court explained that the rule governing waiver of immunity by litigation conduct rests on the need to avoid "unfairness" and "inconsistency," as well as to prevent a State from selectively using immunity to achieve a litigation advantage. <u>Lapides</u>, 535 U.S. at 620. Indeed, in <u>Lapides</u>, the State recognized that a state statute had waived sovereign immunity from state-law suits in state court, yet sought to invoke the jurisdiction of the federal court only to shield itself from liability that may otherwise attach in state court. <u>Id.</u> at 616. The concerns of

unfairness and inconsistency, therefore, were clearly present in that case. These same concerns were also evident in both <u>Vas-Cath</u> and <u>Ramsey</u>, where the States stood to gain a significant tactical advantage in their selective use of immunity. In <u>Vas-Cath</u>, for example, the State initiated PTO proceedings, won a favorable ruling, and then sought to use its immunity to shield the favorable ruling from review in federal court. 473 F.3d at 1379-80. In <u>Ramsey</u>, the State successfully argued that the plaintiffs were required to exhaust administrative remedies, participated in the administrative process for almost two years, and then sought to shield itself from the unfavorable results from that process. 366 F.3d at 9-13. It is easy to see why in those cases, the courts cautioned that "[t]he principles of federalism are not designed for tactical advantage," <u>Vas-Cath</u>, 473 F.3d at 1383, and that "[t]o permit the state to reverse course would contravene the reasons for the doctrine of waiver by litigation conduct recognized by <u>Lapides</u> . . .," <u>Ramsey</u>, 366 F.3d at 16-17.

The same considerations of "unfairness" and "inconsistency" expressed in <u>Lapides</u>, <u>Vas-Cath</u>, and <u>Ramsey</u> simply are not present in the case at bar. BPMC complains that, if DHS is permitted to assert immunity in this lawsuit, DHS will gain an unfair tactical advantage because parties like BPMC will be forced either to litigate in improper venues or face the consequence of moving to dismiss, which includes risking the possibility that the State will assert immunity in a re-filed action. BPMC also argues that, as a side benefit of its unfair tactics, DHS will gain the benefit of initial disclosures under Fed. R. Civ. P. 26 before a court can rule on any motion to dismiss for improper venue.

The concerns BPMC cites hardly rise to the level of those present in <u>Lapides</u>, <u>Vas-Cath</u>, or <u>Ramsey</u>. First, it is unlikely that venue considerations alone would govern a State's decision to assert sovereign immunity from a given lawsuit. Second, it defies common sense that a State keen on retaining its sovereign immunity would, as BPMC posits, risk subjecting itself to liability merely to obtain initial disclosures, hoping that the defendant will object to the chosen venue, which is, of course, a waivable defense. <u>See</u> Fed. R. Civ. P. 12(h)(1). Finally, BPMC ignores the fact that these concerns are not even present in this case, both because DHS did not choose the forum of the 1997 lawsuit - it intervened in ongoing litigation – and because the current action was initiated *in that same venue*. Therefore, the concerns of "unfairness" and "inconsistency" raised by BPMC simply are not the types of concerns that should preclude DHS from asserting immunity in this case.

In sum, we conclude that any unfairness or inconsistency that would arise from permitting DHS to assert sovereign immunity in the present case is not so substantial as to cause us to diverge from the general principles of waiver that we have laid out in this opinion: that a waiver generally does not extend to a separate lawsuit, and that any waiver, including one effected by litigation conduct, must be "clear." Accordingly, we reject BPMC's first theory as to why DHS should be prevented from asserting sovereign immunity in this case.

B

Next, BPMC argues that DHS should be judicially estopped from asserting immunity because DHS's current position is inconsistent with its position in the 1997 lawsuit, where, in its motion to intervene, it asserted that it was a party over which the court had jurisdiction. Because judicial estoppel is not a matter unique to our jurisdiction, we look to Ninth Circuit law to address this issue. Minn. Mining & Mfg. Co. v. Chemque, Inc., 303 F.3d 1294, 1302 (Fed. Cir. 2002) (citing Wang Labs., Inc. v. Applied Computer Scis., Inc., 958 F.2d 355, 358 (Fed. Cir. 1992)). A district court's decision not to invoke judicial estoppel is reviewed for abuse of discretion. Engquist v. Or. Dept. of Agric., 478 F.3d 985, 1000 (9th Cir. 2007).

The doctrine of judicial estoppel provides that "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (quoting Davis v. Wakelee, 156 U.S. 680, 689 (1895)). The purpose of the doctrine is "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." Id. at 749-50 (internal citations and quotations omitted).

The Supreme Court has identified three factors to consider in determining whether the doctrine applies, but the Court explained that these factors are not "inflexible prerequisites" or an "exhaustive formula." Id. at 750-51. Those factors are

(1) whether a party's later position is "clearly inconsistent" with its earlier position; (2) whether the party succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or second court was misled;" and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. Id.

In this case, the district court found that the second and third factors were present - i.e., it found that DHS affirmatively asserted that the court had jurisdiction over its claims in the 1997 action, an assertion which that court accepted; and DHS would obtain a significant advantage by asserting sovereign immunity in that it would be entitled to absolute immunity from monetary damages. Biomedical Patent Mgmt. Corp., 2006 WL 1530177, at *6. The district court concluded, however, that DHS's positions were not clearly inconsistent because of the "substantial intervening change in federal law" brought about by the Supreme Court's decision in Florida Prepaid, see supra Part I.B, which was issued between the 1997 lawsuit and the present action. Id. Specifically, when DHS intervened in the 1997 lawsuit, it was not settled whether DHS was entitled to assert a sovereign immunity defense in a suit for patent infringement, but after Florida Prepaid, it became clear that DHS was entitled to assert such a defense. Id. As such, the district court concluded that DHS's differing approaches with respect to asserting its sovereign immunity simply mirrored the change in the law, and they could not be characterized as "clearly inconsistent." Id. The district court thus found that DHS was not judicially estopped from asserting immunity in this case. Id.

BPMC argues that the district court abused its discretion in reaching its conclusion because DHS's positions were, in fact, clearly inconsistent, and because Florida Prepaid did nothing to change the well-established principle that intervention in a lawsuit constitutes a waiver of immunity. As to BPMC's first point, we do not find that the district court abused its discretion. Perhaps it is more precise to say that, although DHS's positions were inconsistent, the inconsistency is excused by an intervening change in the law. See Maui Land & Pineapple Co. v. Occidental Chem. Corp., 24 F.Supp.2d 1083, 1086 (D. Haw. 1998) (explaining that the application of judicial estoppel is "inappropriate when a party is merely changing its position in response to a change in the law." (citing Arizona v. Shamrock Foods Co., 729 F.2d 1208, 1215 (9th Cir. 1984))). The end result, however, is the same, and DHS is not judicially estopped from asserting a new position that resulted from a change in the law.

In addition, we reject BPMC's argument that there was not actually a change in the law as it relates to DHS's actions because Florida Prepaid did nothing to change the well-established principle that intervention in a lawsuit constitutes a waiver of immunity. In 1997, the validity of Congress' abrogation of state sovereign immunity in the Patent Remedy Act had not yet been considered by the Supreme Court. At that time, DHS could not expect to succeed on a defense of sovereign immunity if sued by BPMC, putting it in the position having nothing to lose by intervening in the 1997 lawsuit, and potentially much to gain by seeking to prevent an adverse result which could affect its interests. The issuance of Florida Prepaid put DHS in a much different position. After Florida Prepaid, DHS could be confident that, if sued, it could assert a defense of

sovereign immunity, which is precisely what it did. Accordingly, we reject BPMC's argument that <u>Florida Prepaid</u> did not effect a change in the law relevant to this case.

BPMC asks that we ignore the change brought on by <u>Florida Prepaid</u> in our analysis because, it asserts, that case was not likely the driving force behind DHS's changing sovereign immunity posture. In support of this point, BPMC notes that, in the 1998 lawsuit, which was filed five days after the 1997 lawsuit was dismissed but *before* the Supreme Court decided <u>Florida Prepaid</u>, DHS asserted the affirmative defense of Eleventh Amendment sovereign immunity. Clearly, the differing position between the 1997 lawsuit and the 1998 lawsuit cannot be explained by a change in the law because none had occurred at that time.

This court, however, is not asked to assess whether any unfairness would arise from DHS's decision to assert sovereign immunity in connection with the *1998* action. The question here is whether it is fundamentally unfair to allow DHS to assert its immunity in this *2006* lawsuit solely because it chose to intervene in a related action almost ten years earlier; we conclude it is not.

We find that the district court correctly determined that DHS is not judicially estopped from asserting sovereign immunity in the present lawsuit, and did not abuse its discretion by dismissing this action in the face of BPMC's argument to the contrary.

C

BPMC also argues that the conduct of the State of California in the patent system, and particularly patent litigation, operates as a general waiver for all California State defendants participating in patent suits. This argument merits little discussion.

The Supreme Court in Coll. Sav. Bank expressly overruled prior case law supporting the notion BPMC urges – i.e., that a state can *constructively* waive its Eleventh Amendment immunity by its participation in a regulatory scheme. 527 U.S. at 680 ("We think that the constructive-waiver experiment of Parden was ill conceived, and see no merit in attempting to salvage any remnant of it."); see also Vas-Cath, 473 F.3d at 1381 ("It is established that a state's participation in the federal patent system does not of itself waive immunity in federal court with respect to patent infringement by the state . . ."). This argument, therefore, must be rejected.

D

Finally, BPMC argues that a recent Supreme Court decision, Central Virginia Community Coll. v. Katz, 546 U.S. 356, 126 S.Ct. 990 (2006), implicitly overruled Florida Prepaid such that sovereign immunity is no longer available in patent infringement actions. BPMC raises this issue on appeal, however, only to "preserve[] it for potential Supreme Court review." The holding in Katz was so closely tied to the history of the Bankruptcy Clause and the unique aspects of bankruptcy jurisdiction that it cannot be read to extend to actions for patent infringement. See, e.g., Katz, 546 U.S. at 378, 126 S.Ct. at 1005 ("In ratifying the Bankruptcy Clause, the States acquiesced in a subordination of whatever sovereign immunity they might otherwise have asserted in proceedings necessary to effectuate the *in rem* jurisdiction of the bankruptcy courts."). Because we find that Katz cannot be read to overrule Florida Prepaid, either expressly or implicitly, we find that the district court correctly rejected this argument.

III

For the foregoing reasons, we find that DHS is not precluded from asserting Eleventh Amendment sovereign immunity in this case. We, therefore, affirm the decision of the district court.

<u>AFFIRMED</u>

Each party shall bear its own costs.