# United States Court of Appeals for the Federal Circuit

2008-1218, -1439

ULTIMAX CEMENT MANUFACTURING CORPORATION,
HASSAN KUNBARGI, and KA GROUP,

Plaintiffs/Counterclaim Defendants-
Appellants,

and

HEARTLAND CEMENT SALES COMPANY,

Plaintiff/Counterclaim Defendant-
Appellee,

and

RC CEMENT HOLDING COMPANY, SIGNAL MOUNTAIN CEMENT COMPANY,
RIVER CEMENT COMPANY, HERCULES CEMENT COMPANY,
and RC CEMENT COMPANY,

Counterclaim Defendants,

v.

CTS CEMENT MANUFACTURING CORPORATION
(doing business as CTS Cement Manufacturing Company),
EDWARD K. RICE, RAPID-SET PRODUCTS CO. (doing business as RSC, Inc.),
CTS BULK TERMINALS CO., CHEM-COMP SYSTEMS, INC., JACK V. GOODMAN,
PARAGON BUILDING PRODUCTS, INC., LAWRENCE B. COLLINS,
BLUE DAISY CEMENT PRODUCTS, INC., KURT CAILLIER,
A & A READY MIXED CONCRETE, INC., RYAN VANDERHOOK, SR.,
SHORT LOAD CONCRETE, INC., SIR-MIX CONCRETE PRODUCTS,
WHITE CAP INDUSTRIES, INC., THE QUIKRETE COMPANIES,
and GRUPO CEMENTOS DE CHIHUAHUA,

Defendants/Counterclaimants-
Cross Appellants.

Saied Kashani, Saied Kashani Law Offices, of Los Angeles, California, argued for plaintiffs/counterclaim defendants-appellants.

Michael R. Annis, Husch Blackwell Sanders LLP, of St. Louis, Missouri, argued for plaintiff/counterclaim defendant-appellee.

James W. Geriak, Orrick, Herrington & Sutcliffe LLP, of Irvine, California, argued for defendants/counterclaimants-cross appellants. With him on the brief were Kurt T. Mulville and Thomas J. Gray.

William J. Robinson, Foley & Lardner LLP, of Los Angeles, California, for amicus curiae Foley & Lardner LLP.

Appealed from: United States District Court for the Central District of California

Chief Judge Alicemarie H. Stotler

# United States Court of Appeals for the Federal Circuit

2008-1218, -1439

ULTIMAX CEMENT MANUFACTURING CORPORATION,
HASSAN KUNBARGI, and KA GROUP,

Plaintiffs/Counterclaim
Defendants-Appellants,

and

HEARTLAND CEMENT SALES COMPANY,

Plaintiff/Counterclaim Defendant-
Appellee,

and

RC CEMENT HOLDING COMPANY, SIGNAL MOUNTAIN CEMENT COMPANY,
RIVER CEMENT COMPANY, HERCULES CEMENT COMPANY,
and RC CEMENT COMPANY,

Counterclaim Defendants,

v.

CTS CEMENT MANUFACTURING CORPORATION
(doing business as CTS Cement Manufacturing Company),
EDWARD K. RICE, RAPID-SET PRODUCTS CO. (doing business as RSC, Inc.),
CTS BULK TERMINALS CO., CHEM-COMP SYSTEMS, INC., JACK V. GOODMAN,
PARAGON BUILDING PRODUCTS, INC., LAWRENCE B. COLLINS,
BLUE DAISY CEMENT PRODUCTS, INC., KURT CAILLIER,
A & A READY MIXED CONCRETE, INC., RYAN VANDERHOOK, SR.,
SHORT LOAD CONCRETE, INC., SIR-MIX CONCRETE PRODUCTS,
WHITE CAP INDUSTRIES, INC., THE QUIKRETE COMPANIES,
and GRUPO CEMENTOS DE CHIHUAHUA,

Defendants/Counterclaimants-
Cross Appellants.

Appeals from the United States District Court for the Central District of
California in Case No. 02-CV-578, Chief Judge Alicemarie Stotler.

DECIDED: December 3, 2009

Before LOURIE, DYK, and PROST, Circuit Judges.

LOURIE, Circuit Judge.

Ultimax Cement Manufacturing Corporation, Hassan Kunbargi, and KA Group (collectively "Ultimax") appeal from the judgment of the United States District Court for the Central District of California granting summary judgment of noninfringement, invalidity, laches, and indefiniteness relating to certain claims of U.S. Patents 4,957,556 ("the '556 patent"); 6,113,684 ("the '684 patent"); and 6,406,534 ("the '534 patent"),[1] as well as the court's grant of summary judgment that no trade secret was violated,[2] its failure to disqualify the law firm representing CTS Cement Manufacturing Corporation (doing business as CTS Cement Manufacturing Company) and its codefendants[3]

---

[1]    See Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp., No. SA CV 02-578, 2004 U.S. Dist. Lexis 29580 (C.D. Cal. Dec. 6, 2004) ("'684 Indefiniteness and '556 Noninfringement and Laches Opinion"); Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp., No. SA CV 02-578 (C.D. Cal. May 5, 2006) ("Order Denying Reconsideration of '556 Noninfringement"); Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp., No. SA CV 02-578 (C.D. Cal. Jan. 24, 2008) ("'534 Noninfringement Opinion"); Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp., No. SA CV 02-578 (C.D. Cal. Jan. 24, 2008) ("'534 Written Description Opinion"); Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp., No. SA CV 02-578 (C.D. Cal. Jan. 24, 2008) ("'534 Anticipation and Obviousness Opinion").

[2]    See Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp., No. SA CV 02-578 (C.D. Cal. Dec. 6, 2004) ("Trade Secret Opinion").

[3]    CTS's codefendants are Edward K. Rice, Rapid-Set Products Co. (doing business as RSC, Inc.); CTS Bulk Terminals Co.; Chem-Comp Systems, Inc.; Jack V. Goodman; Paragon Building Products, Inc.; Lawrence B. Collins; Blue Daisy Cement Products, Inc.; Kurt Caillier; A & A Ready Mixed Concrete, Inc.; Ryan Vanderhook, Sr.; Short Load Concrete, Inc.; Sir-Mix Concrete Products; White Cap Industries, Inc.; The Quikrete Companies; and Grupo Cementos de Chihuahua.

(collectively "CTS"),[4] and its denial of leave to amend the complaint.[5] CTS cross-appeals from the court's denial of its motion to make the case exceptional and to award attorney fees and sanctions.[6] Heartland Cement Sales Company ("Heartland") supports Ultimax in opposing CTS's cross-appeal. We affirm in part, dismiss in part, vacate in part, reverse in part, and remand.

## BACKGROUND

Ultimax and CTS both produce rapid-hardening, high-strength cement. Hassan Kunbargi, the owner of Ultimax Cement, and Edward K. Rice, the owner of CTS, have a long history together. In 1984, as Kunbargi began experimenting with cement chemistry as a graduate student at the University of California, Los Angeles ("UCLA"), Rice became Kunbargi's mentor and sought an adjunct faculty position at UCLA so that he could serve as Kunbargi's advisor. In late 1985, Kunbargi began to work for Rice's company, CTS, and together they worked as independent contractors for another company, Fibermesh, Inc. In 1989, after demonstrating the invention disclosed in the '556 patent to Rice, Kunbargi ceased working for Rice, and in September 1990, he received the '556 patent, entitled "Very Early Setting High Strength Early Cement." Years later, Kunbargi filed patent applications that issued as the '684 patent in

---

[4] See Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp., No. SA CV 02-578, 2007 U.S. Dist. Lexis 44096 (C.D. Cal. May 7, 2007) ("Disqualification Opinion").

[5] See Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp., No. SA CV 02-578 (C.D. Cal. Sept. 15, 2004) ("Opinion Denying Leave to Amend").

[6] See Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp., No. SA CV 02-578 (C.D. Cal. May 28, 2008) ("Exceptional Case Opinion").

September 2000 and the '534 patent in June 2002. Ultimax now owns the three patents in suit, which all relate to rapid-hardening, high-strength cement.

In June 2002, Ultimax and Heartland (collectively "Plaintiffs") sued CTS for infringement of the '684 and '534 patents, misappropriation of trade secrets, and several business torts. After amending their complaint twice, Plaintiffs alleged infringement of claims 9–11 of a third patent, the '556 patent; claim 17 of the '684 patent; and claims 10 and 11 of the '534 patent. See '684 Indefiniteness and '556 Noninfringement and Laches Opinion, 2004 U.S. Dist. Lexis 29580, at *16. All of the asserted claims of the '556 patent recite "soluble $CaSO_4$ anhydride," also known as "soluble calcium sulfate anhydride." Claim 9 of the '556 patent, which is representative of the asserted claims of that patent, reads as follows:

> 9. A very early setting, ultra high strength cement consisting essentially of 10% to 30% by weight $C_4A_3\bar{S}$, 5% to 25% by weight soluble $CaSO_4$ anhydride and 45% to 85% by weight hydraulic cement and having a compressive strength on the order of 3000 psi within approximately one hour following hydration.

'556 patent col.12 ll.5–10. The specification redefines common chemical symbols by, for example, stating that "C" represents $CaO$, "A" represents $Al_2O_3$, and "$\bar{S}$" represents $SO_3$. Id. at Abstract, col.1 ll.38–46.

Claim 17 of the '684 patent, the only claim on appeal from that patent, depends from claim 14. Claims 14 and 17 of the '684 patent were corrected after the patent issued. Those claims, after the Certificates of Correction were issued, read as follows:

> 14. A very early setting, ultra high strength cement comprising:
>
> a hydraulic cement containing $CaO$, $\{(C,K,N,M)_4(A,F,Mn,P,T,S)_3(cl,\bar{S})\}$ and a member selected from the group consisting of $\{(C_9S_3\bar{S}_3Ca(f\ cl)_2\}$, $C_5S_2\bar{S}$ and mixtures thereof.
>
> . . .

17. The very early setting, ultra high strength cement of claim 14 and having a compressive strength greater than 3000 psi within approximately one hour following hydration.

'684 patent col.16 l.62–col.17 l.7, Certificates of Correction. Like the '556 patent specification, the '684 patent specification redefines common chemical symbols by, for example, stating that "C" represents $CaO$, "K" represents $K_2O$, and so on for many of the letters used in claimed compounds. Id. at col.1 l.59–col.2 l.5. Furthermore, the specification states that "f" represents fluorine, normally denoted "F," and that "cl" represents chlorine, normally denoted "Cl." Id. In the specification and throughout the parties' briefs, the compound $(C,K,N,M)_4(A,F,Mn,P,T,S)_3(cl,S)$ is referred to as "crystal X," and the compound $C_{10}S_3\bar{S}_3(f,cl)$, which is different from the claimed compound $C_9S_3\bar{S}_3Ca(f\ cl)_2$, is referred to as "crystal Y." Id. at col.5 ll.29–32. Crystal Y is not a claimed term and need not be further referred to as such.

Once Plaintiffs filed suit, the district court issued a scheduling order setting a cutoff date in January 2003 for motions to amend the pleadings. In August 2004, Plaintiffs moved for leave to file a third amended complaint, which the court denied, based on Plaintiffs' delay. See Opinion Denying Leave to Amend, No. SA CV 02-578. In December 2004, the court granted CTS's motion for summary judgment dismissing Plaintiffs' claim for misappropriation of trade secrets, reasoning that the alleged secret had been publicly disclosed in a Japanese patent. See Trade Secret Opinion, No. SA CV 02-578. At the same time, the court granted summary judgment on several patent validity and enforceability issues, including that the claims of the '684 patent were indefinite because crystal X encompassed over 5000 possible compounds and because another claimed compound lacked a comma between "f" and "cl," that CTS did not

infringe the asserted claims of the '556 patent based on a construction of the word "anhydride," and that the '556 patent was unenforceable due to laches. See '684 Indefiniteness and '556 Noninfringement and Laches Opinion, 2004 U.S. Dist. Lexis 29580. Plaintiffs moved for reconsideration, focusing on the summary judgment of noninfringement of the '556 patent, which the court denied in May 2006. See Order Denying Reconsideration of '556 Noninfringement, No. SA CV 02-578.

In May 2007, the district court denied Plaintiffs' motion to disqualify CTS's counsel, who had been listed on a power of attorney as entitled to prosecute a patent application on an invention by Rice and Kunbargi when they had both worked for Fibermesh. See Disqualification Opinion, 2007 U.S. Dist. Lexis 44096. In January 2008, after allowing the parties to submit further summary judgment motions, the court granted CTS's motions for summary judgment that the '534 patent was invalid as anticipated, obvious, and lacking written description support, and that it was not infringed. See '534 Anticipation and Obviousness Opinion, No. SA CV 02-578; '534 Written Description Opinion, No. SA CV 02-578; '534 Noninfringement Opinion, No. SA CV 02-578. Finally, in May 2008, having disposed of the merits of the case, the court denied CTS's motion to make the case exceptional and for attorney fees. See Exceptional Case Opinion, No. SA CV 02-578.

Ultimax timely appealed the district court's decisions relating to the patents and trade secret, its failure to disqualify CTS's law firm, and its denial of leave to amend the complaint. CTS cross-appealed the court's denial of its motion to make the case exceptional and to award attorney fees and sanctions. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

DISCUSSION

A.    Patent-Related Issues

    1.    Infringement of the '556 Patent

In finding the '556 patent not infringed, the district court first construed the claim term "soluble $CaSO_4$ anhydride." The court defined "anhydride," primarily using a dictionary, as "a compound formed from an acid by removal of water." '684 Indefiniteness and '556 Noninfringement and Laches Opinion, 2004 U.S. Dist. Lexis 29580, at *41. The court reasoned that, if the claim drafter had intended to refer to calcium sulfate from which water has been removed, which was Ultimax's interpretation, it would have used the term "anhydrous $CaSO_4$" or "anhydrite," which is a specific term for anhydrous calcium sulfate. Id. The court acknowledged the observation of the neutral court-appointed expert, Dr. Seible, "that 'given the context in which "anhydride" is used in Patent '556, claims 9–11, it is not unreasonable to assume that the author meant anhydrite and not anhydride.'" Id. at *41–42 (quoting Dr. Seible's report). However, the court decided that the specification did not redefine "anhydride" or alter its ordinary meaning, which would require an acid. Id. at *41–45. Even though one skilled in the art might realize that the drafter intended the claim to refer to "anhydrite" instead of "anhydride," the court held that it could not substitute terms, as that would constitute redrafting the claims, which was forbidden even when the failure to substitute terms would lead to a strange result. Id. Thus, according to the court, the claim term "soluble $CaSO_4$ anhydride" required that the compound include not only calcium sulfate, but also an acid from which water has been removed. Because CTS's cement did not contain

an acid from which water had been removed, the court granted summary judgment of noninfringement. Id. at *45.

Ultimax argues that the district court erred in construing "soluble $CaSO_4$ anhydride" to refer to a compound derived from an acid. According to Ultimax, the court erroneously used the stand-alone definition of "anhydride," without context. Ultimax asserts that the dictionary definition treats "anhydride" as a stand-alone compound, but in the context of the claim, it is a modifier, modifying the compound "calcium sulfate." Ultimax further argues that the court found its own definition inconsistent with the specification and unknown in the art, and that the neutral expert's finding also refuted the court's construction. According to Ultimax, even CTS's documents use "anhydride" and "anhydrite" interchangeably. Thus, Ultimax argues, the court should have adopted a definition consistent with the specification and the art.

CTS responds that the district court correctly gave "anhydride" its ordinary meaning, which is different from the meaning of "anhydrite" and refers to an acid from which water has been removed. CTS's product does not contain such a material. According to CTS, the court correctly based its decision on the specification's lack of use of the term "anhydrite" and neutral expert testimony.

We agree with Ultimax that the district court erroneously construed "soluble $CaSO_4$ anhydride" to mean "a compound formed from an acid by removal of water" and hold that the term should be construed as "soluble anhydrous $CaSO_4$," or "soluble anhydrous calcium sulfate." We review claim construction de novo on appeal. Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc). We begin a claim construction analysis by considering the language of the claims themselves. See

Phillips v. AWH Corp., 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). However, "claims must be read in view of the specification, of which they are a part." Id. at 1315 (quotation marks omitted). "[A] court should also consider the patent's prosecution history, if it is in evidence. . . . Like the specification, the prosecution history provides evidence of how the [Patent Office] and the inventor understood the patent." Id. at 1317 (citations and quotation marks omitted).

Furthermore, courts may "rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." Id. at 1322–23 (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1584 n.6 (Fed. Cir. 1996)). However, "[a] claim should not rise or fall based upon the preferences of a particular dictionary editor, or the court's independent decision, uninformed by the specification, to rely on one dictionary rather than another." Id. at 1322. Indeed, "the authors of dictionaries or treatises may simplify ideas to communicate them most effectively to the public and may thus choose a meaning that is not pertinent to the understanding of particular claim language. The resulting definitions therefore do not necessarily reflect the inventor's goal of distinctly setting forth his invention as a person of ordinary skill in that particular art would understand it." Id. (internal citation omitted).

Here, without the benefit of our opinion in Phillips, which was issued after the district court's opinion in this case, the court erroneously relied on expert testimony and a single dictionary definition to the exclusion of other dictionary definitions and, most importantly, the context in which the term was used within the claim and the specification. Although the word "anhydride" appears in the term "soluble $CaSO_4$

anhydride," its proper construction requires consideration of the context of the rest of the term. "Anhydride," when placed next to "CaSO$_4$," is intended as a modifier, modifying "CaSO$_4$," or "calcium sulfate." In other words, the term refers to calcium sulfate from which any associated water has been removed. Indeed, dictionaries other than that relied on by the court allow "anhydride" to refer to a compound other than one obtained by removing water from an acid, based on context. For example, the definition that Plaintiffs proffered defines "anhydride" as "[a] chemical compound formed from another, _often_ an acid, by the removal of water." J.A. 3749 (emphasis added) (citing definition from The American Heritage Dictionary of the English Language (2000)). Thus, especially in light of the ambiguity of the proffered dictionary definitions, the context must define what compound has had water removed. Here it is calcium sulfate, not an acid.

The context of the entire specification further supports the conclusion that "soluble calcium sulfate anhydride" means "soluble anhydrous calcium sulfate." First, the word "anhydride" never appears alone in the specification, but only as a modifier of "calcium sulfate." See '556 patent Abstract, col.3 l.51, col.3 l.55, col.8 l.6, col.8 ll.8–9, col.9 l.43, col.10 l.19, col.10 l.21, col.10 l.43, col.10 l.50 (referring to the same compound as "soluble CS anhydride"), col.5 l.16 (referring to "soluble calcium sulfate anhydride"), col.9 ll.40–41 (referring to the same compound as "soluble c–S anhydride"), col.9 ll.45–46 (referring to "CS anhydride"), claims (referring to both "soluble CaSO$_4$ anhydride" and "soluble CS anhydride"). As the court recognized, "[n]owhere in the teachings of patent '556 is there a discussion of forming a compound from an acid by removal of its water." '684 Indefiniteness and '556 Noninfringement and

<u>Laches Opinion</u>, 2004 U.S. Dist. Lexis 29580, at *41. There is no evidence shown of any acid from which water is removed to yield $CaSO_4$, as there is for acetic acid or maleic acid, which, when water is removed, yield acetic anhydride and maleic anhydride, respectively. Any water removed here is that associated with the method of obtaining calcium sulfate, such as mining, not water originally associated with an acid. As a result, contrary to the district court's conclusion, the context of the specification requires that "soluble calcium sulfate anhydride" be construed as anhydrous calcium sulfate.

Furthermore, contrary to the district court's conclusion, interpreting the claim term to mean "soluble anhydrous calcium sulfate" is not rewriting the claim or correcting a typographical error. The drafters could not have intended to claim "soluble calcium sulfate anhydrite," as that would have been redundant because the word "anhydrite" itself means "anhydrous calcium sulfate." <u>See, e.g.</u>, Webster's Third New International Dictionary of the English Language Unabridged (1986) (defining "anhydrite" as "a mineral consisting of an anhydrous calcium sulfate $CaSO_4$ . . ."). Instead, the term "soluble calcium sulfate anhydride" simply means, in the context of the '556 patent, the same thing as "soluble anhydrous calcium sulfate." The neutral expert, Dr. Seible, agreed that the context of the specification led to the conclusion that the patent drafter likely meant "anhydrite and not anhydride," referring to the entire claim term. <u>Id.</u> at *41–42. As Ultimax points out, CTS and Rice himself, a person of at least ordinary skill in the art, use the word "anhydride" when they mean "anhydrite," with no resulting confusion. Ultimax Br. at 13–14. Thus, interpreting the claim in that way merely restates its plain meaning.

We therefore disagree with the district court's interpretation of "soluble $CaSO_4$ anhydride" to require derivation from an acid, and we instead construe the term to mean "soluble anhydrous $CaSO_4$," or "soluble anhydrous calcium sulfate."  Because we have reversed the court's claim construction, we vacate its holding of noninfringement and remand to the district court the issue of infringement of the '556 patent.

2.     Laches Relating to the '556 Patent

The district court also held that the '556 patent was unenforceable due to laches, granting CTS's motion for summary judgment.  See '684 Indefiniteness and '556 Noninfringement and Laches Opinion, 2004 U.S. Dist. Lexis 29580, at *45–51.  The court found that Plaintiffs had waited twelve years to sue after the '556 patent issued and should have known of CTS's use of the patented cement at the time of issuance, creating a presumption of laches.  Id. at *50.  According to the court, Ultimax should have known of its claim because of Kunbargi's history of working on cement mixtures with, and then having a falling out with, CTS's owner, Rice, and because of Kunbargi's prior affiliation with CTS.  Id. at *48–49.  The court found that, because Kunbargi had demonstrated his invention to Rice before the '556 patent issued, Kunbargi was on "inquiry notice" at the time the patent issued.  Id.  Although Plaintiffs argued that it was not possible to analyze CTS's cement to determine if it infringed the '556 patent, the court maintained that Ultimax could have also proven infringement of the method claims by investigating CTS's methods.  Id. at *49.  The court also found that Kunbargi's hiring of a private investigator in 1997, whose results were inconclusive, did not fulfill his obligation to investigate infringement.  Id.  The court found unpersuasive Kunbargi's assertion that Rice had assured him that CTS's products did not infringe the '556

patent, especially in light of the declaration of CTS's witness, Collins, stating that Kunbargi had expressed his intent to sue CTS as early as 1997, but was waiting for Rice to build up the business. Id. at *50. Finally, because of the delay, the court presumed prejudice to CTS, and it further found prejudice in the loss of testimony of a CTS employee who had died in the interim and the loss of records from a test that had occurred while Kunbargi was working at CTS. Id. at *50–51.

Ultimax argues that the district court erred in granting summary judgment of laches for the '556 patent, as there was no evidence that Ultimax knew or should have known of infringement until it conducted discovery on the '684 patent after filing suit in 2002. Ultimax asserts that it was impossible to test for soluble anhydrite in CTS's product, so it could not have known of the infringement until it saw in CTS's discovery materials that CTS used a process that infringed the '556 patent. In fact, according to Ultimax, Rice had assured Kunbargi that CTS did not infringe because it did not use soluble anhydrite in its cement, which it was not unreasonable for Kunbargi to accept. Further, Ultimax argues that CTS was not prejudiced by the delay because alternative witnesses and documents remained available to replace those that were unavailable.

CTS responds that Ultimax waited thirteen years to add the '556 patent to the suit and should have known of the alleged infringement at least at the time the '556 patent issued. Thus, according to CTS, the laches presumption applies, and Ultimax did not rebut it. CTS argues that Kunbargi knew of CTS's activities even before the '556 patent issued because he had worked for CTS. According to CTS, it was also easy for Ultimax to test CTS's cement's compressive strength and to test for the presence of calcium sulfate. Finally, CTS argues that it was prejudiced by the delay, as a witness

had died, records were not preserved, and CTS had invested in producing the accused cement.

We agree with Ultimax that genuine issues of material fact precluded summary judgment that the '556 patent is unenforceable due to laches, as it is not clear that Ultimax knew or should have known of CTS's alleged infringement before it conducted discovery on the '684 patent in 2002. Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, if genuine issues of material fact preclude summary judgment of laches, "we need not apply [the abuse of discretion] standard[ ] of review" that generally applies to laches. Wanlass v. Fedders Corp., 145 F.3d 1461, 1463 (Fed. Cir. 1998).

To prevail on a defense of laches, CTS must prove two elements: (1) Plaintiffs delayed filing suit for an unreasonable and inexcusable length of time from the time they knew or reasonably should have known of their claim against CTS, and (2) the delay operated to the prejudice or injury of CTS. Id. at 1463–64 (quoting A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1032 (Fed. Cir. 1992) (en banc)). Plaintiffs' delay "is measured from the time [they] knew or reasonably should have known of [CTS's] alleged infringing activities to the date of suit." Id. (citing A.C. Aukerman, 960 F.2d at 1032). "[T]he underlying critical factors of laches are presumed upon proof that the patentee delayed filing suit for more than six years after actual or constructive knowledge of the defendant's alleged infringing activity." Id. (quoting A.C. Aukerman, 960 F.2d at 1035–36).

CTS does not dispute that Ultimax could not have tested CTS's product for the presence of soluble anhydrite. Without access to CTS's internal procedures, Kunbargi could not have investigated CTS's methods to determine infringement. Even Kunbargi's hiring of a private investigator led to no conclusive result that CTS's products infringed the '556 patent. An infringer does not escape liability merely by infringing in secret. Ultimax could only have asserted infringement of the '556 patent upon a reasonable belief that CTS infringed all of the limitations of the claims, including the limitation requiring soluble anhydrite. See Antonious v. Spalding & Evenflo Cos., 275 F.3d 1066, 1074 (Fed. Cir. 2002) ("[A]n attorney violates [Fed. R. Civ. P.] 11(b)(3) when an objectively reasonable attorney would not believe, based on some actual evidence uncovered during the prefiling investigation, that each claim limitation reads on the accused device either literally or under the doctrine of equivalents."). Thus, because Ultimax alleges, and CTS does not rebut, that Ultimax had no such reasonable belief before 2002, summary judgment of laches should have been precluded.

Although, as CTS argues and the district court found, twelve (or thirteen) years is a long time between patent issuance and filing suit, the only time relevant to the laches presumption is that after Ultimax knew or should have known of the allegedly infringing product. In the case of a claim limitation whose presence is undetectable in a finished product, it is reasonable that Ultimax might not have known or been able to find out whether CTS infringed. Furthermore, there is a genuine issue as to whether Kunbargi fulfilled his duty to investigate by hiring a private investigator, especially given Kunbargi's allegation that Rice assured him that CTS was not infringing because it did not use soluble anhydrite.

Genuine issues of material fact thus precluded summary judgment that Plaintiffs knew or should have known of CTS's alleged infringement before 2002, so we need not address prejudice caused by any alleged delay. We reverse the court's grant of summary judgment of laches and remand for a trial on laches relating to the '556 patent.

3. Indefiniteness of the '684 Patent

The district court granted summary judgment holding claim 17 of the '684 patent indefinite. See '684 Indefiniteness and '556 Noninfringement and Laches Opinion, 2004 U.S. Dist. Lexis 29580, at *21–35. The court found the claim to be indefinite based on its recitation of the formula $(C,K,N,M)_4(A,F,Mn,P,T,S)_3(cl,\bar{S})$, which the specification refers to as crystal X, and the formula $C_9S_3S_3Ca(f\ cl)_2$. Id. The court reasoned that the formula for crystal X is that of a solid solution, a crystalline compound in which various elements can substitute for one another at a particular site on the crystalline structure. Id. at *26. Thus, for example, "the compound $(Mg, Fe)_2$, (Mg = magnesium and Fe = iron) can have four different combinations" because it can consist of Mg on both sites, Fe on both sites, Mg on the first site and Fe on the second, or Fe on the first site and Mg on the second. Id. According to the court-appointed expert, the formula for crystal X, with all of its possible permutations, yielded over 5000 possible different compounds. Id. at *26–27. The court declined to limit crystal X to a single compound and held that it was too broad and thus indefinite.[7] Id. at *27–30. The court also found the asserted

_____

[7] The court also stated, referring to crystal X, that the '556 patent "fail[ed] for indefiniteness." '684 Indefiniteness and '556 Noninfringement and Laches Opinion, 2004 U.S. Dist. Lexis 29580, at *28. However, the '556 patent does not claim crystal X; it merely claims $C_4A_3S$, which is one possible compound that is encompassed by the crystal X formula. We therefore do not understand the court's opinion to invalidate any of the claims of the '556 patent for indefiniteness. To the extent that the court intended to find any claims of the '556 patent invalid for indefiniteness, we vacate that holding for

claim indefinite because it lacked a comma between "f" and "cl," indicating that both fluorine and chlorine needed to be present in the claimed compound $C_9S_3\bar{S}_3Ca(f\ cl)_2$. Id. at *30–35. The court declined to correct the error, holding that it was not apparent on the face of the patent, even though it might be clear to one of ordinary skill in the art. Thus, even though the neutral expert recognized that there should be a comma between "f" and "cl," the court found that inconsistencies in the specification and the claims made the proper formulation debatable. Id. at *32–35.

Ultimax argues that the district court erred in finding the '684 patent indefinite as a matter of law. According to Ultimax, there were genuine issues of material fact regarding the proper interpretations of both the formula for crystal X and the formulation "(f cl)," with even CTS's witness, its director of research, agreeing with Ultimax's proposed interpretations. Ultimax asserts that the '684 patent explains that the crystal X formula is a solid solution with substitutions, rather than allowing for 5000 distinct compounds or being overly broad. And, according to Ultimax, the specification also shows that "(f, cl)" is equivalent to the claimed "(f cl)," as the experts understood.

CTS responds that the formula for crystal X encompasses over 5000 different, undisclosed compositions, such that one skilled in the art cannot determine the bounds of the claims. CTS also argues that the formula containing the notation "(f cl)" is insolubly ambiguous because of the error that results from the lack of a comma. Further, according to CTS, even if expert opinions conflict, the court correctly

---

at least the same reasons as we vacate the holding of indefiniteness with respect to the '684 patent, infra.

determined as a matter of law that an ordinarily skilled reader could not determine the bounds of the claims.

We agree with Ultimax that the district court erred in granting summary judgment that claim 17 of the '684 patent is indefinite, as crystal X, even if construed to be as broad as the district court construed it to be, does not render the claim insolubly ambiguous, and the notation "(f cl)" must be viewed through the lens of one of ordinary skill in the art. "We review a district court's grant of summary judgment <u>de novo</u>, reapplying the standard applicable at the district court." <u>Young v. Lumenis, Inc.</u>, 492 F.3d 1336, 1345 (Fed. Cir. 2007). "A determination that a patent claim is invalid for failing to meet the definiteness requirement in 35 U.S.C. § 112, [paragraph] 2 is a legal question [also] reviewed <u>de novo</u>." <u>Id.</u> at 1344. A patent is presumed to be valid, so CTS further faces an evidentiary burden of clear and convincing evidence to show facts supporting a conclusion of invalidity. <u>Id.</u> at 1345. Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Under 35 U.S.C. § 112, second paragraph, the "specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention," which is known as the definiteness requirement. <u>Id.</u> "Claims are considered indefinite when they are not amenable to construction or are insolubly ambiguous. Thus, the definiteness of claim terms depends on whether those terms can be given any reasonable meaning. Indefiniteness requires a determination whether those skilled in the art would understand what is claimed." <u>Young</u>, 492 F.3d at 1346 (internal citations and quotations marks omitted). The

purpose of the definiteness requirement is to ensure that "the claims, as interpreted in view of the written description, adequately perform their function of notifying the public of the scope of the patentee's right to exclude." Honeywell Int'l, Inc. v. Int'l Trade Comm'n, 341 F.3d 1332, 1339 (Fed. Cir. 2003) (quotation marks omitted).

Regarding crystal X, as the district court pointed out, aided by Dr. Seible's expertise, "[s]olid solutions are crystalline compounds where various elements can substitute for one another at a particular site on the crystalline structure." '684 Indefiniteness and '556 Noninfringement and Laches Opinion, 2004 U.S. Dist. Lexis 29580, at *26. Thus, in the crystal X compound, $(C,K,N,M)_4(A,F,Mn,P,T,S)_3(cl,S)$, "C can be substituted by K, N, and M in such a way that [arguably] over 5000 possible combinations can come out of this formula." Id. at *26–27. However, a claim to a formula containing over 5000 possible combinations is not necessarily ambiguous if it sufficiently notifies the public of the scope of the claims. If a member of the public had made, for example, a compound of pure $C_4A_3cl$ or one of $C_4A_3cl$ with some K molecules substituted for some of the C molecules (using the '684 patent's notation), he would know that the compound fit within the set of compounds described by the claims. If, on the other hand, he made a compound with fluorine substituted for chlorine, written in the notation of the '684 patent as $C_4A_3f$, he would know that he did not infringe the literal scope of the claims. Merely claiming broadly does not render a claim insolubly ambiguous, nor does it prevent the public from understanding the scope of the patent. See In re Gardner, 427 F.2d 786, 788 (CCPA 1970) ("Breadth is not indefiniteness."). Moreover, while the formula for crystal X is obviously complex, it is not necessarily indefinite. Thus, the presence of crystal X in the asserted claims does not render the

claims indefinite. Ultimax has argued, to overcome the court's finding of indefiniteness, that a person of ordinary skill would read crystal X narrowly, based on the prosecution history, to be essentially limited to $C_4A_3S$. However, because the court's broader interpretation of crystal X is not indefinite as a matter of law, nor is the formula for crystal X indefinite under Ultimax's argued interpretation, we need not decide whether the term should in fact be construed more narrowly.

As for the formula including the notation "(f cl)," the district court erred in declining to view the notation in light of the knowledge of one of ordinary skill. As the district court recognized, there was "a possible drafting error in the '684 patent, namely, that there should be a comma between the symbols for fluorine and chlorine." '684 Indefiniteness and '556 Noninfringement and Laches Opinion, 2004 U.S. Dist. Lexis 29580, at *30. The court recognized that one of ordinary skill in the art would know that there should be a comma between "f" and "cl," as Dr. Seible did, but it held that it could not correct a typographical error if it was only clear based on the understanding of one of ordinary skill; it needed to be clear on the face of the patent. Id. at *33–35. According to the court, without a comma, "both fluorine and chlorine must be present in the compound. A comma changes the possible makeup of the formula allowing for the presence of either fluoride or chloride or both, but not requiring the presence of both molecules." Id. at *32.

We have held that "[a] district court can correct a patent only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." Novo Indus., L.P. v. Micro Molds Corp., 350 F.3d 1348,

1357 (Fed. Cir. 2003). Those determinations must be made from the point of view of one skilled in the art. "Claim definiteness is analyzed not in a vacuum, but always in light of the teachings of the prior art and of the particular application disclosure as it would be interpreted by one possessing the ordinary level of skill in the pertinent art." Energizer Holdings v. Int'l Trade Comm'n, 435 F.3d 1366, 1370 (Fed. Cir. 2006) (quotation marks omitted). Thus, although courts cannot "rewrite claims to correct material errors," id., if the correction is not subject to reasonable debate to one of ordinary skill in the art, namely, through claim language and the specification, and the prosecution history does not suggest a different interpretation, then a court can correct an obvious typographical error. In that regard, we note that the court has determined that the claimed formula $C_9S_3S_3Ca(f\ cl)_2$ "corresponds to no known mineral," and that one of ordinary skill in the art would know that the formula should contain a comma.

We therefore reverse the district court's summary judgment determinations that the formula for crystal X and the compound including the notation "(f cl)" are indefinite. We also direct the court to enter summary judgment that claim 17 is not indefinite based on either formula.

### 4. Validity and Infringement of the '534 Patent

The district court granted CTS's motions for summary judgment that the '534 patent was invalid as anticipated, obvious, and lacking written description support, and that it was not infringed. See '534 Anticipation and Obviousness Opinion, No. SA CV 02-578; '534 Written Description Opinion, No. SA CV 02-578; '534 Noninfringement Opinion, No. SA CV 02-578. In its briefs, Ultimax requested reversal of the court's determinations, particularly its noninfringement determination. However, at oral

argument, Ultimax stated, with respect to claims 10 and 11 of the '534 patent, that it was not concerned with the court's finding of invalidity of claims 10 and 11. See Oral Arg. 12:55–14:58, Oct. 5, 2009, available at http://oralarguments.cafc.uscourts.gov/ mp3/2008-1218.mp3. Because Ultimax has waived the argument that the '534 patent is not invalid, its argument as to infringement is moot. We therefore dismiss Ultimax's appeal with respect to the '534 patent.

B.     Non-Patent-Related Issues

1.     Leave to Amend the Complaint

In September 2004, Plaintiffs sought leave to file a third amended complaint, seeking to allege willful infringement against one defendant, to add another defendant, to allege that all defendants infringed all three patents, and to specifically allege that all defendants were jointly and severally liable for lost profits. Opinion Denying Leave to Amend, No. SA CV 02-578, slip op. at 2. The district court denied the motion. Id. at 4. The court reasoned that Plaintiffs had missed the January 2003 deadline for amending the pleadings. Id. at 2. The court further explained that Plaintiffs did not show good cause to modify the scheduling order because they had admitted to becoming aware of the circumstances allegedly justifying an amendment in March and April 2004, and had waited five months to file the motion. Id. at 3. The court also reasoned that Plaintiffs had already twice amended their complaint, and allowing a late amendment would require reopening several summary judgment motions that had already been briefed and heard in part, prejudicing CTS. Id. at 4.

Ultimax argues that the district court abused its discretion in denying leave to amend the complaint. According to Ultimax, CTS had already engaged in discovery on

2008-1218, -1439                    22

the new claims that Plaintiffs sought to add, so CTS would not be prejudiced by an amendment. Ultimax also asserts that the proposed amendment would simply clarify the second amended complaint, further proving a lack of prejudice to CTS. Finally, Ultimax argues that the court abused its discretion by denying Plaintiffs leave to amend but later allowing CTS to file new summary judgment motions out of time. CTS responds that the district court was within its discretion to deny leave to amend, as Ultimax waited until long after the deadline and after learning the relevant information before moving to amend.

We agree with CTS that the district court permissibly denied Ultimax's motion for leave to file a third amended complaint. We apply regional circuit law to a trial court's procedural decisions that relate to issues not unique to our exclusive jurisdiction, including motions for leave to amend. See Regents of the Univ. of New Mexico v. Knight, 321 F.3d 1111, 1123 (Fed. Cir. 2003). Under Ninth Circuit law, a trial court's denial of leave to amend a pleading after the deadline has passed is reviewed for an abuse of discretion. See Coleman v. Quaker Oats Co., 232 F.3d 1271, 1295 (9th Cir. 2000); Johnson v. Mammoth Recreations, 975 F.2d 604, 607 (9th Cir. 1992) (requiring "clear abuse of discretion"). In general, once the court has filed a scheduling order, Federal Rule of Civil Procedure 16 applies to motions to amend the pleadings. Coleman, 232 F.3d at 1294; Johnson, 975 F.2d at 607–08. Rule 16 states that "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "Good cause" has been defeated by undue delay in moving to amend, combined with a need to reopen discovery based on the proposed amendment. Coleman, 232 F.3d at 1295. Thus, the district court was clearly within its discretion to

deny the motion to amend based on undue delay and a similarly burdensome need to reopen summary judgment motions. Furthermore, as the court noted, "'[a] district court's discretion over amendments is especially broad where the court has already given a plaintiff one or more opportunities to amend his complaint.'" Opinion Denying Leave to Amend, No. SA CV 02-578, slip op. at 4 (quoting Kaplan v. Rose, 49 F.3d 1363, 1370 (9th Cir. 1995)). Thus, Plaintiffs' previous two amendments of their complaint further support the court's denial of the motion. Ultimax does not overcome its own failure to show good cause for the amendment by demonstrating a lack of prejudice to CTS or by pointing to the court's allowance of out-of-time summary judgment motions by CTS. We therefore affirm the district court's denial of Plaintiffs' motion to amend their complaint.

2.    Trade Secret Claims

In December 2004, the district court granted CTS's motion for summary judgment disposing of Plaintiffs' trade secret claims. Trade Secret Opinion, No. SA CV 02-578, slip op. at 4. The court reasoned that the claimed trade secret of the use of a combination of lithium carbonate and citric acid in calcium sulphoaluminate cement had been publicly disclosed in a Japanese patent, preventing it from being a secret and therefore defeating a trade secret claim. Id. at 3a. Further, according to the court, even if Plaintiffs were permitted to define the secret as a more specific ratio of the two compounds, the publication of the more general combination in the Japanese patent encompassed the specific ratio. Id.

Ultimax argues that the court erred in dismissing the trade secret claims. According to Ultimax, a secret's availability from a published source is not a defense to

trade secret theft under California law unless CTS also obtained the secret from the published source, which CTS did not do. Instead, Ultimax argues, CTS illegally obtained the secret from Ultimax. Ultimax adds that, contrary to CTS's argument, the secret was not disclosed in the '684 patent.

CTS responds that it is undisputed that the use of lithium carbonate and citric acid in cement was published in the Japanese patent and elsewhere. Furthermore, according to CTS, Ultimax also disclosed the use of lithium carbonate and citric acid in cement in the '684 patent. CTS asserts that a non-public secret is required for a trade secret.

We agree with CTS that the court properly granted summary judgment disposing of Plaintiffs' trade secret claims. We apply the trade secret law of the appropriate state, in this case, California. Roton Barrier v. Stanley Works, 79 F.3d 1112, 1116 (Fed. Cir. 1996). The Ninth Circuit reviews the district court's grant of summary judgment de novo. Universal Health Servs., Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004). Summary judgment is appropriate when a party cannot establish an essential element of its case. See Fed. R. Civ. P. 56(c) (Summary judgment is appropriate if "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.").

Under California law, a trade secret must "(1) [d]erive[ ] independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [be] the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d). Thus, a trade secret must not have already been "generally

known to the public." "Public disclosure, that is the absence of secrecy, is fatal to the existence of a trade secret." In re Providian Credit Card Cases, 96 Cal. App. 4th 292, 304 (Cal. App. 1st Dist. 2002). Further, "[i]t is well established that disclosure of a trade secret in a patent places the information comprising the secret into the public domain. Once the information is in the public domain and the element of secrecy is gone, the trade secret is extinguished and the patentee's only protection is that afforded under the patent law." Stutz Motor Car of Am. v. Reebok Int'l, 909 F. Supp. 1353, 1359 (C.D. Cal. 1995) (quotation marks, citations, and footnote omitted); see also Forcier v. Microsoft Corp., 123 F. Supp. 2d 520, 528 (N.D. Cal. 2000).

Ultimax's argument focuses on how CTS obtained the alleged secret information, attempting to rebut a possible defense to a trade secret claim, but that is irrelevant if there is no secret. Here, Ultimax has not shown that it had a secret. Information disclosed in a patent, even a foreign one, is "generally known to the public," especially the relevant public in the cement industry. Indeed, one of the primary purposes of patent systems is to disclose inventions to the public. See Bruckelmyer v. Ground Heaters, Inc., 445 F.3d 1374, 1379 (Fed. Cir. 2006) (finding a foreign patent, like a U.S. patent, "publicly accessible" because "one skilled in the art exercising reasonable diligence" could find it and it was "classified and indexed" in the foreign patent office). We therefore affirm the district court's grant of summary judgment with respect to Plaintiffs' trade secret claims, as Ultimax cannot prove the existence of a secret.

3. Attorney Disqualification

In May 2007, the district court denied Plaintiffs' motion to disqualify CTS's counsel Orrick, Herrington & Sutcliffe, LLP ("Orrick"), and attorney James W. Geriak.

Disqualification Opinion, 2007 U.S. Dist. Lexis 44096, at *32–33. The court based its opinion on the following facts: In June 1986, while Kunbargi was working for Rice at CTS and Rice was Kunbargi's advisor at UCLA, Rice executed an agreement with Fibermesh, providing that any contractor inventions, including those conceived by Rice in a joint effort with others, belonged to Fibermesh. Id. at *11–12. The agreement also provided that, should Fibermesh file a patent application on one of Rice's inventions, Rice would assign the patent to Fibermesh. Id. at *12. During the period of Rice's agreement with Fibermesh, Kunbargi and Rice jointly invented a method of testing cement. Id. at *9. They applied for a patent, which issued in September 1989 as U.S. Patent 4,866,992 ("the '992 patent"). Id. The '992 patent was never assigned, and Fibermesh's name does not appear in the file. Id. at *12.

Between approximately 1986 and 1989, the law firm Lyon & Lyon LLP ("Lyon") prosecuted the '992 patent at the U.S. Patent and Trademark Office ("PTO"). Id. at *9–10. At the time, Geriak was a partner at Lyon, and Kunbargi and Rice designated Geriak, among others, as having power of attorney in connection with the prosecution of the '992 patent. Id. at *10. The parties dispute whether Kunbargi worked directly with Geriak and whether they exchanged any confidences. Id. at *10–11. After the '992 patent issued, Lyon continued to transact business at the PTO regarding the '992 patent, with Geriak listed on the power of attorney form. Id. at *11. In 2001, the 12-year patent maintenance fee for the '992 patent became due, and Rice, acting pursuant to orders from Fibermesh, instructed Lyon not to pay the fee. Id. at *12. The '992 patent lapsed, and Kunbargi, who was not consulted regarding the nonpayment of the maintenance fee, asserted his intention to argue for reinstatement of the '992 patent.

Id. at *12–13. In the fall of 2002, Geriak moved from Lyon to Orrick. Id. at *13. In the summer of 2006, Orrick and Geriak became counsel of record for CTS in this action. Id. By now, the term of the '992 patent has expired. Id.

Based on those facts, the district court denied Plaintiffs' motion to disqualify Geriak and Orrick. The court reasoned that although Geriak had been listed as having power of attorney for the '992 patent, Geriak did not represent the inventors, but represented Fibermesh; according to the court, the agreement executed by Rice and Fibermesh established that Fibermesh was positioned to become the owner of the '992 patent, so the power of attorney was also executed for the benefit of Fibermesh. Id. at *31–32. Because Geriak had never represented Kunbargi, the court held that there was no conflict of interest and no need to disqualify Geriak or Orrick from the case. Id. at *32.

Ultimax argues that the district court abused its discretion in failing to disqualify Geriak and Orrick. According to Ultimax, Geriak represented Kunbargi because the '992 patent was never assigned, and the attorney invoices from Lyon never indicated that Fibermesh was the client. Ultimax asserts that the Lyon attorneys themselves thought Kunbargi was the client. Ultimax also argues that Geriak's move to Orrick is irrelevant for the purposes of disqualification, as he remained the attorney of record on the '992 patent.

CTS responds that the district court correctly found that Geriak and Kunbargi had no attorney-client relationship and did not interact or exchange confidential information. According to CTS, Kunbargi was aware of the agreement giving Fibermesh ownership of the invention, and he was working for Rice and was therefore bound by the

2008-1218, -1439                    28

agreement.  CTS also argues that Geriak was not involved in the prosecution of the '992 patent.  Finally, according to CTS, Geriak's move to Orrick means that no disqualification is necessary.

We agree with CTS that the district court did not abuse its discretion in declining to disqualify Geriak or Orrick.  As a procedural matter not unique to patent law, we review the district court's decision regarding attorney disqualification under the law of the Ninth Circuit.  Sun Studs v. Applied Theory Assocs., 772 F.2d 1557, 1566 (Fed. Cir. 1985).  "[W]e will not disturb a district court's ruling on a motion to disqualify counsel if the record reveals any sound basis for the court's action."  Cohn v. Rosenfeld, 733 F.2d 625, 631 (9th Cir. 1984) (quotation marks omitted).  That is because "the district court has the primary responsibility for controlling the conduct of the attorneys practicing before it."  Id.  There was a sound basis for the court's finding that no disqualification was necessary, as the court permissibly found that no working attorney-client relationship existed between Kunbargi and Geriak.  As the court found, Kunbargi worked for Rice, and his work fell within the scope of the agreement between Rice and Fibermesh that would obligate them to assign the patent to Fibermesh.  The court therefore permissibly found that the '992 patent application was prosecuted for the benefit of Fibermesh, and the power of attorney was executed for the company's benefit.  See Sun Studs, 772 F.2d at 1568 (reversing district court's disqualification of an attorney under Ninth Circuit law because, although the inventor had signed a power of attorney, the attorney clearly represented the inventor's employer because the inventor was required to assign the invention to the employer).  Thus, the court did not

abuse its discretion by refusing to disqualify Geriak or Orrick, and we affirm the court's denial of Plaintiffs' motion to disqualify.

### 4. Exceptional Case

Finally, on cross-appeal, CTS argues that the district court abused its discretion in declining to make the case exceptional and denying attorney fees. See Exceptional Case Opinion, No. SA CV 02-578. However, in light of our reversal and vacatur of certain of the court's holdings on summary judgment that originally favored CTS, CTS's cross-appeal is now moot. See Larson Mfg. Co. of S. Dakota, Inc. v. Aluminart Prods. Ltd., 559 F.3d 1317, 1342 (Fed. Cir. 2009). "Because the case has not yet been resolved and the prevailing party has not yet been determined, we necessarily vacate the district court's decision regarding exceptional case status." DH Tech., Inc. v. Synergystex Int'l, Inc., 154 F.3d 1333, 1344 (Fed. Cir. 1998). Accordingly, we vacate the district court's decision on exceptional case.

## CONCLUSION

We have considered the parties' remaining arguments and do not find them persuasive. Accordingly, the judgment of the district court is

AFFIRMED IN PART, DISMISSED IN PART, VACATED IN PART, REVERSED IN

PART, AND REMANDED

COSTS

No costs.

2008-1218, -1439                    30